## COUNTY OF RANDOLPH *v.* POST.

1. A company is none the less a railroad company, within the meaning of the act of the general assembly of the State of Illinois, approved Nov. 6, 1849, authorizing counties to subscribe to the capital stock of railroad companies, because its charter vests it with power to carry on, in addition to the business of such a company, that of a coal, or a mining, or a furnace, or a manufacturing company.

2. It would be an unreasonable restriction of the rights and powers of a municipal corporation to hold that it cannot waive conditions found to be injurious to its interests, or, like other parties to a contract, estop itself.

3. A county in Illinois, a subscriber to the stock of a railway company, agreed to extend the time for completing the road from that originally fixed to a particular date. Before that date, the county, by its proper officers, declared the road completed to its satisfaction, delivered its bonds, and received the stock of the company in return therefor. *Held*, that its action constitutes a waiver and an estoppel which prevent it from raising the objection that the contract was not performed in time.

4. The bonds issued by the county court of Randolph County, Ill., bearing date Jan. 1, 1872, and reciting that they are issued in payment of a subscrip-

tion of $100,000 to the capital stock of the Chester and Tamaroa Coal and Railway Company, in pursuance of an election held by the legal voters of said county, on the sixth day of June, 1870, and by virtue of the provisions of an act of the general assembly of the State of Illinois, entitled "An Act supplemental to an act to provide for a general system of railroad corporations," are, with the coupons thereto attached, valid, and binding upon the county.

ERROR to the Circuit Court of the United States for the Southern District of Illinois.

This was an action of assumpsit on certain coupons attached to bonds issued by the county of Randolph, in payment of a subscription of $100,000 to the capital stock of the Chester and Tamaroa Coal and Railway Company.

On the 3d of May, 1870, the county court of Randolph County, at a special term thereof, passed an order, which provided that the question of such subscription be submitted to the legal voters of the county; that until the railroad of the company should be built, and cars run thereon from within the corporate limits of the city of Chester to the line of the county, no bonds should be registered or paid; and that no bonds should be registered or paid unless the said railroad should be completed from Chester to that line within eighteen months from the time of subscription.

At an election, held June 6, 1870, the vote resulted in favor of the subscription. The county thereupon, on the twenty-seventh day of that month, made its subscription on the books of the company. On July 26, 1870, the county court ordered that the bonds be executed and placed in the hands of certain trustees. On Aug. 17 following, it modified that order, by directing that the bonds be executed only at a regular term of the court; and again, on the 6th of September, 1871, further modified it, by requiring the judge and clerk of the court to execute them, attach its seal thereto, and deliver them to the trustees, and that the company should issue to the latter a certificate of stock to the amount of $100,000; which was accordingly done.

On the 6th of October, 1871, upon the representation of the president of the company and others, that the work on said railroad was far advanced toward completion through the county of Randolph, but that from unavoidable difficulties of

transportation, caused by unprecedented low water in the rivers, the company found itself unable to get its iron upon the ground in the time contemplated by the previous orders of the county court, the latter made an order, which, after reciting those before issued, concluded as follows : —

" Whereas, the time for completing said road will expire on the twenty-seventh day of December, 1871, and it appearing that said company are doing all they can to complete said road within said time, it is therefore ordered by the court that the time for completion of said railroad be extended to the first day of February, A.D. 1872, and that, in case said road shall be completed, and cars shall have run thereon, from within the corporate limits of the city of Chester to the county line between the counties of Randolph and Perry, by the first day of February, A.D. 1872, the said trustees shall deliver said bonds to said company, or their authorized agent, and shall deliver said certificate of stock to said county court or their order."

Plaintiff proved that the road was built and completed within the time required by the county court through the county of Randolph, according to contract ; that it was upon its completion, and ever since has been, in full operation, with trains of cars carrying freight and passengers as a common carrier through said county, on the line prescribed by the contract; that said bonds were not issued and delivered to said railroad company until after the officers of said county had gone over said railroad in the cars of said company through said county, and expressed themselves satisfied with the construction of said railroad.

The bonds were delivered to the company Jan. 19, 1872. The coupons sued on were as follows, differing only in the time of maturity and number of the bond to which each was attached : —

"COUNTY OF RANDOLPH, STATE OF ILLINOIS :

" The county of Randolph will pay to the bearer, on the first day of July, 1872, at the agency of the State treasurer, in the city of New York, forty dollars, it being one year's interest on bond No. 183, for $500.

" JOHN R. SHANNON,
" *County Clerk of Randolph Co.*"

The bonds were in the following form : —

"UNITED STATES OF AMERICA.

"*State of Illinois, Randolph County.*

"No. 1.]          RAILROAD BOND.          [$500.

"Know all men by these presents, that the county of Randolph, State of Illinois, is indebted to the Chester and Tamaroa Coal and Railway Company, or bearer, in the sum of $500, lawful money of the United States, with interest from date, at the rate of eight per cent per annum, payable annually on the first day of July in each year, at the agency of the State treasurer, in the city of New York, on the presentation and surrender of the respective interest-coupons hereto annexed.

"The principal of this bond shall be due and payable ten years from the date hereof, at said agency of State treasurer, in New York.

"This bond is one of a series of bonds issued by the county of Randolph in payment for $100,000 of the capital stock of the Chester and Tamaroa Coal and Railway Company, in pursuance of an election held by the legal voters of Randolph County, Ill., on the sixth day of June, 1870, and by virtue of the provisions of an act of the general assembly of the State of Illinois entitled, 'An Act supplemental to an act to provide for a general system of railroad corporations.'

"And for the payment of said sum of money and accruing interest thereon in the manner aforesaid the faith of the county of Randolph is hereby irrevocably pledged, as also property, revenue, and resources.

"In testimony whereof, the county court of said county of Randolph have caused these presents to be signed by the county judge and by the clerk of the county court of said county, and sealed with the seal of said court, at Chester, Ill., in said county, on this first day of January, A.D. 1872.

"ALEXANDER WOOD, *County Judge.*
"JOHN R. SHANNON, *County Clerk.*"

The act of the general assembly, referred to in the bonds, is, together with the provision of the constitution bearing upon the case, set forth in the opinion of the court.

The case was, by agreement, tried by the court below without the intervention of a jury. Judgment was rendered

for the plaintiff; whereupon the county sued out this writ of error.

Submitted on printed argument by *Mr. John M. Palmer* for the plaintiff in error.

The county of Randolph had no authority to subscribe to the capital stock of the Chester and Tamaroa Coal and Railway Company. *Kenicott* v. *Supervisors*, 16 Wall. 452.

That corporation was not a " railroad company " within the meaning of the act of the general assembly of Illinois of Nov. 6, 1849, which confers authority upon counties to become shareholders only in corporations organized solely for the construction of railroads.

If, from the nature of this corporation, the county could not become the purchaser of shares of its capital stock, and participate in all its doings to the extent that private individuals might, every other fact or circumstance in its conduct or acts, or in those of the people of the county, or of their officers, imposes no liability and creates no estoppel.

The argument that a county may bind itself to secure the construction of a railroad, without becoming a subscriber to, or a purchaser of shares of, the capital stock of the company by which it is constructed, assumes that a county may issue bonds in aid of such construction, without reference to the act of 1849, or, in other words, that it may do so without law; for that act alone is recited in the bonds, and relied on to sustain their validity.

The argument, that the bonds and coupons sued on are valid because the proceeds were used in the construction of a railroad, not only rests on a fact which is not alleged nor proved, but impliedly concedes their invalidity, if the proceeds had been otherwise used, and thus deprives them of the character of commercial paper claimed for them, reduces them to the class of simple contracts, and renders it necessary to prove the consideration upon which they were given.

To assert that a county may own stock in a corporation, to the extent of participating in the exercise of some but not all of the powers of a stockholder, is to disregard the statute, as well as the general principles of law.

But even if the subscription was made by proper authority, it

was a contract between the county and the railroad corporation. The constitution of the State, which took effect July 2, 1870, deprived the county of all power in respect to such contracts, beyond what was necessary to enable it to complete them according to the measure of its duty as therein defined, and incapacitated it to assume new obligations, or to waive any of the conditions upon which its duty to issue bonds was by contract made to depend. All the powers of the county officers, after the adoption of the constitution, were, with respect to the execution of the contract, merely ministerial, and in no sense discretionary.

The railroad was not completed from within the limits of the city of Chester to the line of Randolph County, within eighteen months from the date of the subscription, as provided by the contract of subscription. The bonds were therefore made by the officers of the county, without authority of law, and are for that reason void.

The test of the soundness of this conclusion is, that the company, by reason of its failure to complete its road within the time and in the manner contemplated by the vote of the people and by the contract pursuant thereto, had no just claim to the bonds; and the officers of the county had no rightful power or authority to issue them.

*Mr. S. M. Cullom, contra.*

Mr. Justice Hunt delivered the opinion of the court.

By consent of the parties, this case was tried by the circuit judge without the intervention of a jury. It resulted in a judgment for the plaintiff below, for the amount of the coupons upon certain bonds issued by the county of Randolph and held by the plaintiff, thus establishing the validity of an issue by said county of bonds in aid of the Chester and Tamaroa Coal and Railway Company. The county, dissatisfied with this result, brings its appeal to this court, and rests its objections upon two principal grounds: —

1. The first allegation of error is, that the issue of these bonds was forbidden by the constitution of the State of Illinois.

A separate article of the constitution of that State provided as follows: —

"No county, city, town, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make a donation, or loan its credit in aid of such corporation : *Provided*, however, that the adoption of this article shall not be construed as affecting the right of any municipality to make such subscriptions when the same have been authorized under existing laws by a vote of the people of such municipality prior to such adoption."

This provision took effect on the 2d of July, 1870. *Richards* v. *Donaghue*, 66 Ill. 73.

If, then, the county of Randolph had been authorized, prior to July 2, 1870, to make the subscription in question, the bonds were valid, so far as this objection is concerned. If it was not so authorized, the subscription was prohibited by the constitution, and the bonds were void. It will be observed that the decision of this point depends not upon the question whether a subscription had in fact been made by a county prior to July 2, 1870, but whether the county had been authorized in the manner specified to make such subscription. The provision does not apply where such subscriptions "have been authorized under existing laws."

The act of the legislature of Illinois, respecting railroad companies, in force prior to the adoption of the constitutional provision, contained the following sections : —

"77. Subscriptions and loans. Whenever the citizens of any city or county in this State are desirous that said city or county should subscribe for stock in any railroad company already organized or incorporated, or hereafter to be organized or incorporated, under any law of this State, such city or county may and are hereby authorized to purchase or subscribe for shares of the capital stock in any such company, in any sum not exceeding $100,000, for each of such cities or counties ; and the stock so subscribed for, or purchased, shall be under the control of the county court of the county, or common council of the city, making such subscription or purchase, in all respects as stock owned by individuals.

"78. For the payment of such stock, the judges of the county court of the county, or the common council of the city, making such subscription or purchase, are hereby authorized to borrow money, at a rate not exceeding ten per cent per annum, and to pledge the faith of the county or city for the annual payment of

the interest, and the ultimate redemption of the principal; or, if the said judges or common council should deem it most advisable, they are hereby authorized to pay for such subscription or purchase in bonds of the city or county making such subscription, to be drawn for that purpose, in sums not less than fifty dollars, bearing interest not exceeding ten per cent per annum, provided that no bond shall be paid out at a rate less than par value.

"79. The railroad companies already organized or incorporated, or hereafter to be organized or incorporated, under the laws of this State, are hereby authorized to receive the bonds of any county or city becoming subscribers to the capital stock of such company, at par, and in lieu of cash, and to issue their bonds, bearing interest not exceeding ten per cent per annum, for any money by them borrowed for the construction of their railroad and fixtures, or for the purchase of engines and cars; and for such purpose may dispose of any bonds by them received as aforesaid."

The section following enacts that no such bonds shall be issued unless a majority of the voters of the municipality shall, at an election called for that purpose, sanction such issue. It is not necessary to give the details of this section, as no question exists as to the holding the election on the sixth day of June, 1870, and to the vote thereat, as set forth in the bonds.

The point of the objection here made is, that the Chester and Tamaroa Coal and Railway Company is not a railroad company within the meaning of the general act already cited. It is said that it is a mining and a manufacturing company, and not a railroad company.

By an act of the legislature, passed March 4, 1869, that company was created a corporation, and "vested with all power, privileges, and immunities which are or may be necessary to engage in mining, and to construct, complete, and operate a railroad, with single or double track, commencing at Chester, in Randolph County, Ill., thence running easterly on the most eligible route, *via* Pinckneyville, in Henry County, Ill., to Tamaroa, in said Perry County; and for this purpose said company are authorized to lay out their said railroad, not exceeding one hundred feet in width through the whole length, and, for the purpose of cuttings, embankments, stone, or gravel, may take as much more land as may be necessary for the proper construction and security of said railroad, and shall have power

to extend the same to connect with or cross over any other rail-road within the State of Illinois, and may make such lateral or branch road or roads to any coal-lands belonging to said company as they may deem necessary for the successful prosecution of their business; and said company may enter upon and take possession of so much land as may be necessary for the construction and maintenance of said railroad and branches, dépôts, side-tracks, water-stations, engine-houses, machine-shops, and other buildings and appendages necessary to the construction and working of said road; and in case said land be not donated to said company for such purpose, it shall be lawful for said company to proceed to condemn said land, as provided by the laws of the State concerning right of way.

" SECT. 2. The said corporation may take and transport upon said railroad any person or persons, merchandise, or other property, and may fix, establish, take, and receive such rates of toll, for any passenger and property transported upon the same, as the directors shall, from time to time, establish, subject to such limitations and restrictions as are or may be provided by general law.

" SECT. 3. The said corporation is hereby vested with power to purchase, hold, and convey real and personal estate; to give and receive promissory notes; to enter into and carry on all kinds of mechanical and manufacturing business; to erect mills, furnaces, founderies, factories, and machine-shops, for the manufacture of flour, lumber, iron, castings, machinery, farming-utensils, and any other kind or description of article not forbidden by law; and may erect and build marine ways or dry-docks, and use the same for the purposes of repairing and building boats, barges, or any other description of water-craft; may buy, build, and own boats, barges, or other vessels, and navigate the same for the transportation of their coal, manufactures, or for other purposes."

We are at a loss to conceive what words could be used to create a railroad company that are not here used. The persons named are " hereby created a corporation," and authority is given " to construct, complete, and operate a railroad " from Chester, a point in Randolph County on the Illinois Railroad, to Tamaroa, a point on the Mississippi River. They are authorized to extend their road, by lateral branches, to connect with other roads; and the power of eminent domain, to condemn such

land as may be needed for building the railroad, is vested in the corporation.

The corporation is authorized to take and transport upon said road all persons and property, and to fix and establish rates of toll for the transportation of such persons and property.

It is not the less a railroad company within the statute authorizing municipal subscriptions because it is also a coal, or a mining, or a furnace, or a manufacturing company. By the third section of its charter it is vested with large power to carry on various kinds of mechanical and mining business, and is authorized to build and use vessels and barges in the transportation of coal, and for other purposes.

If the legislature had placed great restrictions upon its capacity as a railroad corporation, it might plausibly be objected that the purpose of a municipal subscription to its stock would be so far thwarted. Such purpose is to promote the settlement and increase the business and enhance the value of the property of the municipality and of its citizens by furnishing the means of passage to all wishing to come or to go, and providing a means of bringing in the produce of other regions and of furnishing a market for its own. The vast corn-growing lands of the State of Illinois depend for their value upon their convenience to a market. A few years ago, its rich production was almost valueless, for the want of railroads or canals to carry it to other regions, where it could have been sold to advantage.

No court has authority to say that an operating railroad, is less a railroad, is less valuable to a county through which it passes, because it proposes to mine and transport coal, to manufacture and transport flour, to carry on iron founderies, digging or buying the raw materials, employing men to manufacture them into different kinds of iron or articles of use or luxury, and transporting them as may be required, than if it confined itself to the business of a carrier. So far as the probable success or advantages of such undertakings are concerned, it is not for us to decide upon it. The people of Randolph knew what the powers of the corporation were, and if they thought well of the undertaking, it was a matter for their judgment only. The question of power being settled, the matter of judgment, wisdom, or expediency is not for reconsideration by the courts.

2. The objection is made, secondly, that the subscription of the county was a conditional one, and that the condition was not complied with.

The allegation is, that by the terms of the contract of subscription the road was agreed to be completed and in operation within eighteen months from the date of the subscription, which would be on the twenty-seventh day of December, 1871, and that it was not completed until the nineteenth day of January, 1872.

We do not think the fact upon which this objection is based appears from the record. It is certain that no attention was called to it in the court below, and no ruling there asked or had in relation to it. It is there stated that " the plaintiff proved that the road was built and completed within the time required by the county court of Randolph, according to contract; that it was upon its completion put into operation, and has been ever since and now is in full operation, with trains of cars carrying freight and passengers as a common carrier through said county of Randolph on the line prescribed by the contract. . . . Said bonds were not issued and delivered to said railroad company until said county officers . . . had first rode over said railroad in cars of said company through the county of Randolph, and expressed themselves satisfied with the construction of said railroad."

This plain statement is supposed to be overthrown by the evidence of a petition presented to the county court by the company on the sixth day of October, 1871, in which it is stated that, for reasons there given, it will not be able to complete the road within the time stipulated, and asking an extension from Dec. 27, 1871, until Feb. 1, 1872, and of the order of the county court granting such extension.

This is evidence, no doubt, that the company then believed that it would not be able to complete the road as it had undertaken, and that it desired to guard itself against default, as well as that the county was ready to grant the request. This was, however, ninety days before the expiration of the time stipulated; and it is by no means difficult to believe that the company overcame the existing obstacles. It could not obtain the bonds until the road was completed; and it had the

strongest motive, therefore, not to accept the indulgence of the county, if it was possible to avoid it.

The evidence shows that the bonds had been delivered on the nineteenth day of January, thirteen days before the expiration of the extended time, and that the road was completed and in operation before such delivery. It appears, also, from the citation already made from the record, that the road was built through the county "according to contract." When it is stated in the bill of exceptions that the "plaintiff, to maintain the issue on his part, offered in evidence the contract made by the county court of Randolph County, also the order of the county court extending the time for the completion of the road," it is plain that the distinction between the contract and the order of extension was well understood, and that the statement that the road was found to be completed according to the contract, means within the time and in the manner prescribed by the original contract, and not by the extension.

If the fact assumed is doubtful, we are not called upon to study out a defect for the purpose of overthrowing the judgment, which was not objected to, or in any manner alluded to on the trial.

Should we, however, assume the fact to be as is insisted by the plaintiff in error, it does not follow that its conclusion is correct. The constitutional provision alluded to prohibited all loans to corporations of municipal credits after July 2, 1870. If, however, a subscription for that purpose had already been authorized by a vote of the people, the right to make such subscription was not affected by the prohibition. If not authorized before the date mentioned, the subscription was absolutely prohibited. If previously authorized, the constitution had nothing to do with it. It was as if no such ordinance existed.

We should unreasonably restrict the rights and powers of a municipal corporation were we to hold that it did not possess the power to alter its legally made contract by waiving conditions found to be injurious to its interests, or that it could not estop itself, like other parties to a contract. Bigelow on Estoppel, 464; *Moran* v. *Comm'rs*, 2 Black, 722; *Zabriskie* v. *Cleveland*, 23 How. 400; *Pendleton* v. *Avery*, 13 Wall. 297; 1 Dill. Mun. Corp., sects. 375, 383, 385, 398.

In the present case, the county, by an order in writing made on the sixth day of October, 1871, expressly agreed, for reasons satisfactory to itself, to extend the time of completing the road from the twenty-seventh day of December, 1871, to the first day of February, 1872. Before that time, — to wit, on the nineteenth day of January, 1872, — it declared the road to be completed to its satisfaction, delivered its bonds to the company, and received its stock in return, which it still holds and owns. That this constitutes a waiver and an estoppel, which under ordinary circumstances would prevent the obligor from raising the objection that the contract had not been performed in time, the authorities leave no doubt. *Muller* v. *Ponder*, 55 N. Y. 325; *Barnard* v. *Campbell*, id. 457; *McMarler* v. *Bank*, id. 222; *Kelly* v. *Scott*, 49 id. 601; *Dezell* v. *O'Dell*, 3 How. 215; *Grand Chute* v. *Winegar*, 15 Wall. 372; *Mercer Co.* v. *Hackett*, 1 Black, 336; *Gelpcke* v. *Dubuque*, 1 Wall. 175; id. 184; *County of Moultrie* v. *Savings Bank*, 92 U. S. 631; *Converse* v. *City of Fort Scott*, id. 503.

We are of the opinion that the case was well decided, and the judgment is accordingly          *Affirmed.*